**In re Terence Lee PACKHAM and Lynnette Marie Nilsson Packham, Debtors.**

**Bankruptcy No. 90C–04129.**

United States Bankruptcy Court, D. Utah.

April 26, 1991.

**604**

Barbara W. Richman, Salt Lake City, Utah, Chapter 13 Trustee.

Robert Fugal, Bird & Fugal, Provo, Utah, for debtors.

Steven T. McMaster, Asst. Atty. Gen., Salt Lake City, Utah, for UHEAA.

## MEMORANDUM OPINION AND ORDER

GLEN E. CLARK, Chief Judge.

The matter presently before the court is the confirmation of the debtors' Chapter 13 plan of reorganization. A hearing was had on December 12, 1990. Robert Fugal, Esq. appeared on behalf of the debtors. Steven T. McMaster, Esq., Assistant Utah Attorney General, appeared on behalf of the Utah Higher Education Assistance Authority (UHEAA). Barbara W. Richman, the standing Chapter 13 trustee (trustee), represented herself. After hearing testimony, reading the memoranda submitted by the parties, and engaging in independent research, the court dismissed the case concluding that the debtors' proposed plan did not meet the requirements of 11 U.S.C. § 1325(b)(1)(B).[1] This memorandum opinion is submitted in support of the court's ruling.

## ISSUE

The sole issue in this case is whether the debtors' proposed Chapter 13 plan complies with the disposable income test set forth in § 1325(b)(1)(B). In particular, have the debtors provided that all of their projected disposable income be contributed to their plan given the fact that they have allocated a monthly payment in the amount of $217.00 to the Church of Jesus Christ of Latter-day Saints (LDS Church) as a "tithe"[2]?

---

1. Unless otherwise stated, all future references to Code sections are to Title 11 of the United States Code.

2. A "tithe" is "[a] tenth part of one's income, contributed for charitable or religious purposes." BLACK'S LAW DICTIONARY 1330 (5th ed. 1979); *see also* B. McCONKIE, MORMON DOCTRINE 796 (2d ed. 1966) "Salaries, wages, gifts, bequests, inheritances, the increase of flocks, herds, and crops, and all income of whatever nature are subject to the law of tithing." B. McCONKIE at 796.

Tithing finds historic origins from the following passage in the Old Testament:

## FACTS

On July 5, 1990, the debtors filed a petition seeking relief under Chapter 13 of the Bankruptcy Code. Their supplemental budget reveals that their combined, monthly net income was $2,166.67. (Debtors' Response to Objection to Plan, Exhibit B at 2). Total unsecured debt was $31,683.39. (Debtors' Amended Chapter 13 Statement at 1). Outstanding student loans owed by the debtors were in the amount of $20,-220.00. (Debtors' Chapter 13 statement at 13).

According to their plan, the debtors had proposed to make monthly payments in the amount of $285.00 to the trustee for a period of sixty months thereby providing a twenty percent return to unsecured creditors. At the hearing, the debtors also testified that to assure confirmation they would be willing to make a lump sum contribution of the interim payments that they had made to date. (Transcript at 35 & 41).

The trustee and the UHEAA, an unsecured creditor, objected to confirmation of the debtors' plan claiming that it did not comply with the requirements of § 1325(a) and (b). In particular, the objecting parties asserted that the plan was not proposed in good faith and that it did not provide that all of the debtors' disposable income was being contributed. These arguments were focused on the fact that the debtors' supplemental budget indicated that they planned to tithe $217.00 of their monthly net income to the LDS Church. (Debtors' Response to Objections, Exhibit B at 2).

> Will a man rob God? Yet ye have robbed me. But ye say, Wherein have we robbed thee? In tithes and offerings. Ye are cursed with a curse: for ye have robbed me, even this whole nation. Bring ye all the tithes into the storehouse, that there may be meat in mine house, and prove me now herewith, saith the Lord of hosts, if I will not open you the windows of heaven, and pour you out a blessing, that there shall not be room enough to receive it. And I will rebuke the devourer for your sakes, and he shall not destroy the fruits of your ground; neither shall your vine cast her fruit before the time in the field, saith the Lord of hosts. And all nations shall call you blessed: for ye shall be a delightsome land, saith the Lord of hosts.
>
> *Malachi* 3:8–12 (King James).

■ At the hearing, the debtors testified as to the reasonableness of all of the expenses in their supplemental budget. (Transcript at 8–9; 12–15; 20–25; 31–32; 34–38; 40–44). Hearing the testimony, the court found that, with the exception of the tithe payment, all of the expenses that were budgeted by the debtors were reasonably necessary to be expended for their, or their dependents, maintenance or support. The sole issue, therefore, is whether the tithe payment to the LDS Church should be considered a reasonably necessary living expense thereby exempting it from inclusion as disposable income under § 1325(b)(1)(B).[3]

Mr. Packham testified that he had been a member of the LDS Church all of his life; (Transcript at 9); and Mrs. Packham testified that she had been a member since she was nine years old. (Transcript at 38). The debtors both testified that they had paid a tithe to the Church since they had begun to earn money; (Transcript at 9 & 38); and that they had consistently paid tithing in their recent years as a married couple. (Transcript at 16–17). Mr. Packham testified that he had never received a bill or accounting from the LDS Church, but rather, that tithing was operated on an honor system and it was known that a ten percent tithe is required by the Church. (Transcript at 17–18; 26–27). He also stated that he pays tithing because he "feel[s] it is a commandment from the [L]ord to pay as a debt to him for what he has done for us, for what God has done for us. We

3. The trustee and the UHEAA also grounded their objections to the debtors' plan in 11 U.S.C. § 1325(a)(3). That subsection states that: "Except as provided in subsection (b), the court shall confirm a plan if—(3) the plan has been proposed in good faith and not by any means forbidden by law...." *See In re Rasmussen,* 888 F.2d 703 (10th Cir.1989); *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir.1983); *In re Whitelock,* 122 B.R. 582 (Bankr.D.Utah 1990); and *In re Iacovoni,* 2 B.R. 256 (Bankr.D.Utah 1980).

In this case, the court finds that the debtors have not acted in bad faith in proposing their plan and that they have met their burden of proof under § 1325(a). They have not, however, met their burden under § 1325(b)(1)(B) and, therefore, their plan is not confirmable.

feel that it is an inspired commandment. ... [The requirement of tithing is] not only in ... the bible and other church scriptures[,] but prophets and presidents of the church have reiterated that it is a commandment and I believe them to be stating the word of God." (Transcript at 9). Mrs. Packham stated that "I believe that the tithing should be paid before the creditors. I believe that our greatest creditor is the [L]ord. He is the one that has given us the most." (Transcript at 46). In response to counsel's question of whether they intended to continue to pay tithing, Mr. Packham testified that "Yes. Whether the Court rules in our favor on this or not, somehow we will do our best to continue paying our tithing. Whether that means taking a part-time job or, you know, whatever it takes we're going to do it." (Transcript at 11).

Neither of the debtors viewed tithing to be an option. (Transcript 10 & 38). Both stated that there were numerous material benefits associated with being a member of the Church, such as reduced tuition at Brigham Young University. (Transcript at

4. The debtors attended Brigham Young University. Despite the reduced tuition, the debtors incurred student loans in the amount of $20,220.00. Mr. Packham testified that he could not remember if he had disclosed his tithing obligation on loan forms that he had completed. (Transcript at 32–33).

5. One noted authority states:

It is the practice of the Church to issue certificates, commonly called recommends, in order to identify persons as members of the Church or to certify to their worthiness to receive certain ordinances or blessings. For instance, when a church member moves from one ecclesiastical jurisdiction to another, a recommend is sent to his new presiding officer identifying him as a member of record in the Church; or, when a worthy church member desires to obtain a patriarchal blessing or participate in the sacred ordinances of the temples, he is given a recommend certifying as to his worthiness to gain the desired blessings. ·

B. McCONKIE at 620. He also states that:

It appears from 2 Cor. 3:1 that the practice prevailed among the primitive saints of introducing faithful members of the Church from one group of saints to another by means of *epistles of commendation* or letters of commendation. That is, the saints were commended, introduced, or recommended to the various local churches by these written certifi-

10–11; 15–16; 33; 40).[4] The debtors testified, however, that those material benefits would not be denied to them if they did not pay tithing. In fact, although Mr. Packham testified that if he did not pay tithing he would not feel completely worthy to participate in Church activities, he stated that he could attend Church and participate in Church-sponsored athletic, social, educational, and cultural activities. (Transcript at 19; 27–29; 33–34).

When questioned on cross-examination, the debtors testified that the only Church-related privilege that they believed would be denied to them if they failed to pay tithing was their ability to obtain a temple recommend.[5] Although he could not point to a specific Church mandate and had no personal knowledge thereof, Mr. Packham stated that he believed that persons who did not pay a full tithe would not be entitled to a temple recommend and a recommend was necessary to be chosen for certain callings within the Church hierarchy. (Transcript at 19–20).[6] He also testified

cations. These would correspond to 'recommends' in modern times.
*Id.* at 230–31.

6. Mr. Packham testified that:

[Question by the trustee] [A]re you able in your belief to participate in the functions of your church without paying tithing?

A Yes, we can attend church and participate in most things without paying tithing.

Q What can you not participate in to your belief?

A There is, or course, the temple like I have stated earlier and certain callings specially in bishoprics or the elders quorum presidency where I believe that you would not be asked to hold those without the temple recommend.

Q Have you had any such callings of your own personal knowledge where that has been a requirement?

A I believe in every calling that they—

Q Of your own personal knowledge, of your experience, has that ever been a requirement?

A Where they asked me if I had it?

Q During the calling where you were asked whether or not you were paying a full tithing?

A I don't think they asked me that because I already had the recommend and that is one of the preconditions.

Q To your knowledge is it possible to obtain a temple recommend based on extenuat-

that the recommend is issued annually and that his failure to obtain a recommend in one year would not preclude him from obtaining a recommend in later years. (Transcript at 29). The failure to have a recommend would, in Mr. Packham's opinion, be a "worry." (Transcript at 30).

Mrs. Packham further testified that, in order to obtain a temple recommend, she had to sign it. One of the questions that she had been asked in the interview that precedes the granting of the recommend was whether she had paid a full tithe. (Transcript at 38–39). She also stated, however, that the interview was not centered on the issue of tithing. (Transcript at 44–45). As her husband, Mrs. Packham did not know whether extenuating circumstances might excuse a Church member from paying tithing.[7]

## DISCUSSION

■ Section 1325 of the Code governs the confirmation of a Chapter 13 plan of reorganization. The debtor has the burden of showing that the requirements of § 1325(a) have been met. As the court has stated, the debtors in this case have met their burden under subsection (a).

■ Given the objection of the trustee and the UHEAA to the debtors' plan, however, the court must examine whether § 1325(b) has been satisfied. That section states, in relevant part, that:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

. . . . .

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

Since a Chapter 13 plan that meets the requirements of § 1325(a) would be confirmed absent the objections of the creditor, the objecting parties have, at a minimum, "the initial burden of producing satisfactory evidence to support the contention that debtor is not applying all of his disposable income" to the plan payments. *Education Assistance Corp. v. Zellner (In re Zellner)*, 827 F.2d 1222, 1226 (8th Cir. 1987) (quoting *In re Fries*, 68 B.R. 676, 685 (Bankr.E.D.Pa.1986)); *In re Fricker*, 116 B.R. 431, 437 (Bankr.E.D.Pa.1990). The proponent of a Chapter 13 plan, however, has the ultimate burden of proof as to the requirements of its confirmation. *In re*

---

ing circumstances when you have been unable to pay a full tithing?
A  Not that I know of.
Q  Not that you know of?
A  No.
Q  Do you have any reason to believe that that is not a possibility for a person with extenuating circumstances?
A  As far as I know they always ask if you are a full tithe payer. If you are not I don't know what they would do.
Q  Can you refer me to any written documentation which would advise you or anyone who was interested of the necessity of being a full tithe payer in order to obtain a temple recommend?
A  I believe there is a manual for the bishop when they become a bishop that would have that kind of documentation in it.
Q  Have you ever been a bishop?
A  No, I have not.
Q  Have you ever been able to look at the manual that you have just referred to?
A  No. My father was a bishop at one time but I did not read his manuals.

Q  You don't know if there are any provisions which would allow for a temple recommend to be issued to persons who pay less than a full tithe; is that correct?
A  I don't know.
(Transcript 19–20).

7. Mrs. Packham stated:
[Question by the trustee] And are you aware of any guiding document or manual which the bishop or those in authority refer to in order to assess whether a person is deemed worthy to receive the temple recommend?
A  Yes, I know they do have one. I have never read it.
Q  You have not read it?
A  No.
Q  So as a result you would not know if it was possible for a person because of extenuating circumstances not to be able to pay a full tithing and yet still be able to receive a temple recommend, do you?
A  No.
(Transcript at 45).

*Lindsey*, 122 B.R. 157, 159 (Bankr.M.D.Fla. 1991); *In re Warner*, 115 B.R. 233, 236 (Bankr.C.D.Cal.1989); *In re Girdaukas*, 92 B.R. 373, 376 (Bankr.E.D.Wis.1988); *In re Navarro*, 83 B.R. 348, 356 (Bankr.E.D.Pa. 1988).

In the present case, the trustee and the UHEAA have met their initial burden by pointing the court to the debtors' amended budget which states that they plan to tithe $217.00 to the LDS Church. The debtors, however, have not met their burden of showing that the money that they have devoted to tithing payments should not be considered disposable income that should be contributed to the plan.

"Disposable income" is defined in § 1325(b)(2), in relevant part, as "income which is received by the debtor and which is not reasonably necessary to be expended —(A) for the maintenance or support of the debtor or a dependent of the debtor...." It is clear that Congress left the determination of what is reasonable to the courts as the language of the statute is vague and the legislative history is sparse.

The court concludes that the tithe proposed by the debtors to the LDS Church is not reasonably necessary for the maintenance and support of the debtors or their dependents. The only alleged loss that the debtors might suffer as a consequence of their failure to pay tithing is the denial of a temple recommend. Denial of a recommend, however, was based on the debtors' speculation. The debtors did not present evidence that the Church would in fact deny them a temple recommend if they failed to make tithing payments.[8] Accordingly, the debtors have not met their burden of proof under § 1325(b).

Even if the debtors had presented competent evidence on the issue of the temple recommend, the court would probably follow the majority line of cases that hold that "while church donations may be a source of inner strength and comfort to those who feel compelled to make them, they are not necessary for the 'maintenance or support of the debtor or dependent of the debtor.'" *In re Miles*, 96 B.R. 348, 350 (Bankr.N.D. Fla.1989) (quoting § 1325(b)(2)(A)). *See also In re Tucker*, 102 B.R. 219, 220 (Bankr.D.N.M.1989); *In re Curry*, 77 B.R. 969 (Bankr.S.D.Fla.1987) (Court denied the confirmation of a Chapter 13 plan under § 1325(a)(3) because the debtor, an ordained minister who was employed by his church, proposed to make tithing payments. In finding a lack of good faith, the court stated that the debtor was not "willing to pay to the trustee for the benefit of his creditors all of his disposable income after provision for his necessary and reasonable living expenses and a reasonable contingency."); *In re Chrzanowski*, 70 B.R. 447, 448 (Bankr.D.Del.1987); *In re Red*, 60 B.R. 113, 116 (Bankr.E.D.Tenn. 1986); *In re Sturgeon*, 51 B.R. 82 (Bankr.S.D.Ind.1985).

*See also In re Tamez*, 110 B.R. 9, 10 (Bankr.S.D.Cal.1990) (Absent an objection by the trustee or an unsecured creditor the court refused to determine whether a charitable contribution was disposable income under § 1325(b). The court, however, denied confirmation of the plan as being proposed in bad faith. One factor that the court looked to was the fact that the debtors had proposed a substantial contribution to their church); *In re Davis*, 68 B.R. 205, 216 (Bankr.S.D.Ohio 1986) (Although the court refused to rule under § 1325(b) due to the lack of an objection to the debtor's proposed plan by the trustee or an unsecured creditor, it noted that a church donation would probably not fall within the

---

**8.** The debtors have quoted the remarks of LDS Elder Marion G. Romney, a former Apostle and member of the First Presidency of the Church, that:

> [T]ithing is a debt which everyone owes to the Lord for his use of the things that the Lord has made and given to him to use. It is a debt just as literally as the grocery bill, or a light bill, or any other duly incurred obligation. As a matter of fact, the Lord, to whom one

owes tithing, is in a position of a preferred creditor. If there is not enough to pay all the creditors, he should be paid first.

Address by Elder Marion G. Romney, Brigham Young University (Provo, Utah Nov. 5, 1968), *reprinted in* SPEECHES OF THE YEAR, THE BLESSINGS OF AN HONEST TITHE, 4 (1968). This is not sufficient evidence of Church policy. Nor is the Church in a position to make the Lord a priority creditor in bankruptcy.

meaning of subsection (b)(2)(A) of that section); *In re Hudson,* 64 B.R. 73, 75 n. 1 (Bankr.N.D.Ohio 1986) (In dismissing a case under § 707(b), the court stated that in evaluating a debtor's income and expenses under that section, it would employ the same prohibitions against allowing debtors to make contributions to non-profit institutions that it would employ in Chapter 13 cases. The court noted that such contributions would be prohibited under § 1325(b)(1) & (2)); *In re Breckenridge,* 12 B.R. 159, 160 (Bankr.S.D.Ohio 1980) (Debtors' plan was not proposed in good faith because, among other things, they had devoted a "significant portion of [their] income to the payment of an entirely discretionary expenditure, a church tithe....").

There are three cases which have confirmed the debtor's plan despite the fact that it provided for the payment of a religious and/or charitable contribution. In *In re Green,* 73 B.R. 893 (Bankr.W.D.Mich. 1987), the court held that denying confirmation of a Chapter 13 plan based solely on the fact that the debtors' planned to make a tithing payment to their church would violate the free exercise clause of the Constitution. The court rejects the court's analysis in *Green. See also Miles,* 96 B.R. at 350; *Reynolds,* 83 B.R. at 684–85.

*In re Navarro,* 83 B.R. 348 (Bankr.E.D. Pa.1988), also rejected the constitutional analysis in *Green,* but went on to hold that the debtors' plan would not be denied confirmation based on the fact that they proposed to make a tithing payment to their church. The court based its ruling on the fact that the debtors had expressed a sincere belief in their church and the necessity to tithe. The court went on to hold that the tithe was reasonably necessary for the maintenance and support of the debtors' family stating that § 1325(b) should be broadly interpreted and that it should not substitute its judgment about the relative value of religious contributions for that of the debtors.

An analysis of § 1325(b) similar to that in *Navarro* was recently annunciated by the court in *In re Bien,* 95 B.R. 281 (Bankr. D.Conn.1989). There, the debtor, similar to

the debtors in the present case, proposed a plan which provided a ten percent tithe to the LDS Church. The court confirmed the plan, over the objection of the trustee, on the basis of stipulated facts that Church members are required to pay a full tithe even if they are partaking in the Church's welfare program and the failure to do so will result in denial of a temple recommend. *Id.* at 281–82. On the basis of these facts, the court allowed the tithe commenting that it was "a condition precedent to full participation in the debtor's religion...." *Id.* at 283. Similar to *Navarro,* the court also set forth the following test: "[W]hether the proposed expense fulfills a bona fide personal commitment intended to serve or promote some religious or spiritual purpose, rather than an effort to hinder, delay, or defraud creditors, and whether there is a nondiscretionary obligation to pay such expense in a specific amount." *Id.* at 282.

In reviewing these cases, the court first finds that the facts in *Bien* are distinguishable from those in the case at hand. In this case, there was not competent evidence on the temple recommend issue. Moreover, contrary to the stipulated facts in *Bien,* the evidence here showed that the failure to make a tithe may not deny the debtors full participation in the Church.

Second, in rejecting the *Bien* and *Navarro* cases, the court notes that "an inquiry into a debtor's 'reasonably necessary' expenses is unavoidably a judgment of values and lifestyles and close questions emerge." *In re Sutliff,* 79 B.R. 151, 156 (Bankr.N.D. N.Y.1987). While the court attempts to avoid superimposing its values for those of the debtors', certain sections of the Code require it to make decisions that unavoidably are made based on its sense of equity of what is right and wrong. *Id.* at 157. For example, see 11 U.S.C. §§ 522(d)(10)(E) & (d)(11), and 523(a)(2)(C) & (a)(8)(B). Section 1325(b) certainly falls within this area of the Code. Thus, by making decisions as to the propriety of including contributions to charitable and/or religious organizations in a debtor's budget, the court, in effect, would be forced to pass on the legitimacy of that organization. Or, as did the courts

in *Bien* and *Navarro*, the court would be forced to decide whether an individual has "a bona fide personal commitment ..." to the religious organization to which it desires to contribute. Such decisions are not for courts to make. As the court in *In re Reynolds*, 83 B.R. 684, 685 (Bankr.W.D.Mo. 1988), so artfully stated:

By whatever name or rite, man has and will seek some entity or institution that answers the unanswerable questions and assuages the unassuageable doubts and concerns of our human existence. But that is each person's free choice; to seek or not, to believe or not; to contribute or not; and who or what is right is not for this Court or any other branch of the state or federal government to decide. This Court may not and must not say what if any portion of debtor's income shall go to support his personal religious beliefs, but this Court may determine what constitutes those items reasonably necessary 'to be expended—(A) for the maintenance or support of a debtor or a dependent.'

Interestingly, the court in *Reynolds*, while seeming to adopt the majority position that tithing should not be considered a reasonable living expense, went on to allow the debtor to amend his plan stating that it would not:

establish [a] hard and fast rule as to what amount or percentage of charitable contribution it will construe as 'reasonably necessary.' That will depend on the circumstances of each case. Certainly some nominal amount will be permissible, but that amount will need to be below 3% of gross income unless very unusual circumstances are present.

*See also In re Cadogan*, 4 B.R. 598, 599 (Bankr.W.D.La.1980) (Case dismissed because the debtors had not amended their plan after the court informed them that their expenses, including a tithing payment, were excessive. Thus, the court implied that some small amount would be tolerated). For the reasons that have been set forth herein, the court will not follow the totality of the circumstances approach stated in *Reynolds*. Moreover, the court will not set a percentage that it deems to be a reasonable charitable contribution.

■ In addition to the majority line of case law, the court notes that in interpreting § 1325(b), it is important to keep in mind that the purpose of Chapter 13 is to provide the maximum recovery to creditors. S.Rep. No. 65, 98th Cong., 1st Sess. 22 (1983). Chapter 13 "contemplates a substantial effort by the debtor to pay his debts" which "may require some sacrifice by the debtor." *Id.* The integrity and creditability of Chapter 13 reorganizations would be substantially diminished if a debtor could budget charitable donations to an organization of its choice thereby forcing its creditors to make de facto contributions to that organization. *See Tucker*, 102 B.R. at 220; *Curry*, 77 B.R. at 970; *Sturgeon*, 51 B.R. at 83–84. *See generally, In re Reyes*, 106 B.R. 155, 159–61 (Bankr.N.D.Ill. 1989) (Appendix containing a statement made by Judge Judith A. Boulden which discusses the purposes of Chapter 13 and maintaining the creditability of that Chapter). Debtors wishing to continue to tithe after the filing of a bankruptcy petition are better suited for relief under Chapter 7 of the Code.

■ The court recognizes that confusion among practitioners as to this issue may, in part, have been caused by Official Form No. 10 which provides a space to list "religious and other charitable contributions" in the debtor's budget at item 4(b)(15).[9] The Official Forms are authorized by Bankruptcy Rule 9009, and that Rule makes clear that they are "prescribed by the Judicial Conference of the United States ... [or] [t]he Director of the Administrative Office of the United States Courts ..." and not by Congress. In fact, the Advisory Committee Notes (1983) to Bankruptcy Rule 1001, which is entitled "Scope of Rules and Forms ...", states that "although Rule

---

**9.** Amendments to the Official Forms have recently been approved by the Judicial Conference and will take effect August 1, 1991. The new forms abrogate the current Official Form

10 and the information therein will be found in revised Form 6. Unfortunately, Schedule J of that form includes a space for debtors to list "charitable contributions."

1001 sets forth the scope of the bankruptcy rules and forms, any procedural matters contained in Title 11 or 28 U.S.C. with respect to cases filed under 11 U.S.C. would control." Furthermore in his comment accompanying his edition of the Rules, Norton points out that "unlike the rules, the Official Forms do not require approval by either the Supreme Court or by Congress, and while they should be observed and should be used with such alterations as may be appropriate under the circumstances, they do not have the force of law." Norton Bankr.Rules Pamphlet 1990–1991 Ed., 12–13. Item 4(b)(15) of Official Form 10, therefore, does not provide authority, or a glimpse of legislative intent, on the question of whether religious and/or charitable contributions should be considered reasonably necessary for the support of the debtor or its dependents under § 1325(b). *See also Curry*, 77 B.R. at 970; *but see Navarro*, 83 B.R. at 356 (Court found it significant that the Official Forms contained a space to list religious and other charitable contributions.)

Accordingly, the court HEREBY ORDERS that confirmation of the debtors' plan of reorganization is DENIED and the case is DISMISSED.