In re Stephanie LYNN, Debtor.

Stephanie LYNN,
Plaintiff/Counterdefendant,

v.

DIVERSIFIED COLLECTION SERVICE and USA Funds, Inc., Defendant/Counterclaimant.

Bankruptcy No. B–92–07224–PHX–SSC.
Adv. No. 92–641.

United States Bankruptcy Court,
D. Arizona.

Feb. 18, 1994.

_____

Alan M. Levinsky, Anderson, Brody, Levinson, Weiser & Horwitz, P.A., Phoenix, AZ, for plaintiff.

Michael W. Carmel, Phoenix, AZ, for debtor.

Lothar Goernitz, Chapter 7 Trustee, Phoenix, AZ.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

On June 12, 1992, STEPHANIE LYNN ("Debtor"), acting *pro se*, filed a complaint to have certain debts deemed dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B).

On July 15, 1992, an answer was filed by UNITED STUDENT AID FUNDS, INC. ("USAF"). The Debtor subsequently obtained the assistance of counsel on a *pro bono* basis. Various pretrial proceedings were conducted in this matter; and a Joint Pretrial Statement was filed by the parties on January 29, 1993. A trial was conducted on this matter on June 2, 1993. At the conclusion of the trial, the Court requested that the Debtor be examined by a physician and that an updated diagnosis and prognosis be presented to the Court concerning the Debtor's medical problems. The medical report was filed on January 13, 1994.[1] The parties were also uncertain as to whether they wished to provide any further evidence to the Court once the medical report was filed. At the status hearing on December 10, 1993, the parties stated that the matter was submitted and the Court could rule.

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure.* This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

## Discussion

The Debtor filed her voluntary petition under Chapter 7 on June 11, 1992. As noted previously, she filed a complaint on June 12, 1992, to determine the dischargeability of certain indebtedness under 11 U.S.C. § 523(a)(8)(B).

The Debtor executed a certain promissory note in favor of the lender at the time the lender advanced the sum of $7,165.08 to the Debtor, so that she could attend the Royal College of Beauty in Mesa, Arizona. The interest rate on the note was eight percent (8%) per annum.

The Debtor obtained this student loan under the Guaranteed Student Loan Program (GSLP), established by the Higher Education Act of 1965, Pub.L. No. 89–329, November 8, 1965, Title IV, 79 Stat. 1219 (20 U.S.C. §§ 1087–1087–4). The Defendant, USAF is a guarantee agency under the GSLP, and was the agency which guaranteed the Debtor's promissory note. The loan is reinsured by the Department of Education of the United States. (The regulations concerning the GSLP are found at 34 CFR § 682.100 *et seq.*)

USAF has paid the lender in full pursuant to the terms of the guaranty, and the lender has endorsed and assigned the promissory note to USAF.

The Debtor owes the current balance of $7,780.77, which includes principal and interest as of January 6, 1993. Interest continues to accrue on the obligation at the rate of eight percent (8%) per annum.

At the time of the trial, the Debtor was no longer employed. She left her position as a secretary for a law firm on May 19, 1993. The Debtor testified that she planned to continue with her education at Northern Arizona University ("NAU"), in Flagstaff, Arizona, commencing in the fall semester of 1993. The Debtor intended to leave for Flagstaff on June 4, 1993, so that she could obtain an apartment with other students and find a part-time job in preparation for the fall semester.

1. The Debtor filed the initial medical report with the Court on July 1, 1993. However, this report cannot be located. The Debtor filed a duplicate report with the Court on January 13, 1994.

Her father has decided to pay her tuition, but she must maintain a B average, if she wishes to get the continued support of her father. The Debtor testified that her father had not yet determined whether to pay for her books.

The Debtor plans on attending NAU, on a full-time basis, for three years in order to obtain a bachelor of arts degree in education. She intends to major in math and special education.

Although the Debtor has earned approximately $12,000 per year, the Debtor wants, and hopes, to receive $22,000 per year as a teacher once she graduates from NAU.

The Debtor testified that her current budget was uncertain, since she had not yet obtained a job in Flagstaff and determined all of her costs. The Debtor estimated her projected monthly Flagstaff expenses to be between the sum of $940 and $990.[2] The Debtor previously certified additional monthly expenses of $320 in a budget that she filed with the Court at the time she filed her complaint.[3]

If the Court concludes that the sum of $320 per month should be included with her projected Flagstaff budget of $990, the Debtor's aggregate projected monthly expenses are $1,310. If we exclude the projected tax payments of $550 per month, the Debtor expects out-of-pocket expenses of $760 per month.

The Debtor also testified that she had extensive repairs made to her truck in May and June, 1993. The cost of the repairs was $70. The Debtor has not explored whether she is able to car pool to school in the fall.

The Debtor also conceded at trial that she was the only one at her Mesa apartment who received the Arizona Republic. No cost for this subscription was indicated.

At one point, the Debtor had lived with her grandmother. In fact, her pet was still being kept by her grandmother. The Debtor testified that she paid $25 per month to her grandmother for pet food. The Debtor did not expect to receive any assistance from her grandmother to help her through school.

The Debtor testified that she was divorced and received no support or maintenance from her ex-husband. It was unclear to what extent the Debtor was entitled to support or maintenance and to what extent she had pursued her rights and remedies to collect same. Conversely, the Debtor and her ex-husband had incurred the sum of $80,000 in debts, of which she was responsible for the amount of $40,000. She had also obtained various student loans, for which she was solely responsible.

The Debtor further testified that she had various expenses which needed to be paid immediately, although said expenses were not being incurred on a monthly basis. For instance, the Debtor needed a $100 deposit for the apartment in Flagstaff, new glasses at a cost of $200, and school supplies at a cost of $200.

The Debtor has also encountered a number of medical problems in recent years.[4]

2. As to her monthly expenses, she estimated

| | | |
|---|---|---|
| $ | 140 | rent. (This is $30 to $40 dollars less per month than what she was paying in Mesa.) |
| | 200 | automobile. (The Chevy S10 truck has over 150,000 miles on it. She estimated certain repairs would need to be made on a monthly basis.) |
| | 250 | Federal withholding for taxes. (This necessarily assumes that she is making some income.) |
| | 250–300 | State withholding for taxes. (This necessarily assumes she is making some income.) |
| | 25 | Pet food. |
| | 25 | Miscellaneous expenses for grooming, such as makeup, haircut. |
| | 50 | telephone. (The Debtor's long-distance charges had previously ranged between $10 to $20 a month.) |
| $940–990 | | Per month. |

3. Although not testified to at the time of trial, the Debtor had previously certified that her monthly expenses in Mesa also included the following:

| | | |
|---|---|---|
| $ | 120 | Food. |
| | 70 | Electric, gas, water. |
| | 20 | Clothing. |
| | 100 | Transportation. (fares, etc.) |
| | 10 | Personal. |
| $ | 320 | |

4. The Debtor has filed a medical report with the Court, which outlines the nature of the Debtor's medical problems. The report notes the ongoing need for medication, and that in spite of the indicated therapy, the Debtor may require "med-

The Debtor estimated that the medicine needed to control her condition, obtainable only by prescription, would cost $90 to $100 per month. The Debtor conceded that she had not expended money to purchase the medication because she did not have enough funds on hand. The Debtor also incurred a $60 medical bill in February, 1993 which has remained unpaid.

The Debtor also discussed her strong religious beliefs and her commitment to turning over ten percent (10%) of her gross wages to her church. Her position was that the money was not hers to spend and that her income must be decreased accordingly. The Debtor testified that at times, she went without food because of her commitment to tithe. She stated that she felt an obligation to tithe if she earned any income. She also conceded that the guidelines of her church did permit her to stop under certain circumstances, such as being impoverished. Nevertheless, she had made a personal decision that, irrespective of her financial circumstances, she would tithe as soon as she earned any income.

The Debtor testified that prior to filing her bankruptcy petition she attempted to communicate with the financial institutions or with those parties whom she believed had the authority to determine whether the payments on her student loans could be deferred. She was never able to get a response.

*General Case Law Concerning Nondischargeability Of A Student Loan*

█ Section 523(a)(8)(B) provides that a student loan may not be discharged, unless "excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents". *See In re Andrews,* 661 F.2d 702 (8th Cir.1981) (hardship discharge inappropriate unless debtor unable to repay loan as agreed without sacrificing minimum standard of living; court should consider debtor's present employment status and prospects therefor, and make findings regarding debtor's reasonable living expenses).

The court in *In re Bagley,* 4 B.R. 248, 250–51 (Bankr.D.Ariz.1980), relied on a Connecticut case to hold that the proper considerations are whether (1) the debtor has (or has reasonable prospects of acquiring) any accumulated wealth; (2) the debtor has a chance of getting, and keeping, steady employment, and whether there is any excess income therefrom; (3) the debtor has sufficient income to maintain a minimal standard of living; and (4) there is any income left, after deducting necessary living expenses, to repay on the loan.

The case of *In re Conner,* 89 B.R. 744, 747 (Bankr.N.D.Ill.1988), has set forth a slightly different three-part test. First, a mechanical test is applied to compare present and future income and expenses to determine the reasonableness of requiring the debtor to repay the loan. *Id.* at 747. Second, an inquiry is made as to whether the debtor has made a good faith effort to repay or renegotiate the loan, minimize expenses and seek a better job. *Id.* Finally, the Court must consider the policy issues; that is, whether the discharge of part or all of the loan will frustrate the Congressional policy underlying the exception. *Id.* Specifically, the Court examined whether the primary reason for the debtor's filing of a bankruptcy petition was a desire to avoid repayment and whether the loans enabled the debtor to acquire education of a type likely to lead to a higher paying job in the foreseeable future. *Id.*

This Court has also reviewed and considered the decision of *In re Brunner,* 831 F.2d 395, 396 (2nd Cir.1987), *affirming* 46 B.R. 752 (S.D.N.Y.1985), which suggests the following three-part test:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of student loans; *and*

(3) that the debtor has made good faith efforts to repay the loans.

ical intervention, as well as close medical follow-up". The Debtor has also testified as to the

nature of her medical problems at various hearings before this Court.

Certainly, the Debtor was in a precarious position at the time of the June, 1993 hearing. She had no income, yet she was committed to moving to Flagstaff and, hence, incurring certain fixed expenses. The Court also does not question that the Debtor is experiencing ongoing medical problems, which have stabilized for the present. The Debtor is not currently taking any medication, but she believes that as a student at NAU, she may be able to get the required medication through a student health service, perhaps at a greatly reduced cost.

The Court also concludes that the Debtor has experienced financial problems, because of the debt incurred primarily by her ex-husband; and that she, in good faith, has attempted to contact her lender to determine if payments on the student loan may, at least, be deferred for a period of time.

These facts indicate that the Debtor has, for instance, met the first and third prong of the *Brunner* test; however, the Debtor has not met the second prong, or that prong of the *Bagley* and the *Conner* test, which considers the reasonable prospects of a debtor receiving any accumulated wealth or any increases in future income. Once the Debtor completes her schooling in three years, she has a reasonable prospect of becoming employed as a teacher and increasing her income to $22,000 per year. Although the Debtor may certainly request that any payments on the student loan be deferred until she completes her schooling,[5] the Debtor has made an insufficient showing that the student loan should be discharged.

### The Effect Of Tithing In A Nondischargeability Analysis

The Court has concluded that the student loan is nondischargeable, primarily on the basis that the Debtor expects to be earning sufficient income to pay the student loan once she graduates from NAU. Nevertheless, the Court shall address what impact tithing has on the Court's determination as to whether the Debtor's current expenses are so great that a failure to discharge the student loan will result in an "undue hardship."

The tithing issue has not previously been addressed by the courts in the context of whether a debt is dischargeable under Section 523(a)(8)(B). The courts have generally addressed the tithing issue in the context of whether a tithe is a necessary expense for maintenance and support of the debtor, or a dependent of the debtor, so as to be omitted from a debtor's "disposable income" calculation in a Chapter 13 proceeding.[6] The courts are not in agreement as to whether a Chapter 13 plan may be confirmed, if a debtor contributes a portion of his or her monthly income to a church.

Every opinion which has considered the issue in a disposable income analysis has addressed whether a court's refusal to confirm a plan solely because of a debtor's desire to tithe is a violation of the Free Exercise Clause of the First Amendment to the United States Constitution. The 1990 Supreme Court decision of *Employment Division, Department of Human Resource v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) has resolved this issue.

Justice Scalia, writing the majority opinion in *Smith,* held "that if prohibiting the free exercise of religion ... is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."[7] 494 U.S. at 878, 110 S.Ct. at

---

**5.** A student is automatically entitled to have student loans deferred upon the filing of the appropriate paperwork with the financial institution, proving that the student has returned to school on a full-time basis.

**6.** The term "disposable income" is defined, pursuant to 11 U.S.C. § 1325(b)(2) as follows:
(b)(2) ... income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor[.]

**7.** *Justice Scalia made the statement in the context of using the imposition of a tax as an example of a law with which all people must comply, even if a person believes that the support of organized government is sinful. Accordingly, the quote above uses the word "law", whereas the actual opinion uses the word "tax".*

1600. Justice Scalia explained that the Supreme Court has long felt that:

> Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.

*Id. citing Minersville School Dist. Board of Educ. v. Gobitis,* 310 U.S. 586, 594–595, 60 S.Ct. 1010, 1012–1013, 84 L.Ed. 1375 (1940).[8]

Although *Smith* applies only to the denial of benefits that result from the violation of a criminal statute, two bankruptcy courts have determined that *Smith* stands for the proposition that "an individual cannot escape a valid neutral law of general applicability merely by asserting that the law violates his or her religious beliefs." *In re Young,* 152 B.R. 939, 951 (D.Minn.1993); *In re Lee,* 162 B.R. 31 (Bankr.N.D.Ga.1993).

According to *Young* and *Lee,* the Bankruptcy Code is not required to yield to the Free Exercise Clause of the First Amendment and to a debtor's desire to tithe. In *Young* the Court determined that Bankruptcy Code Section 548 was a neutral law. Accordingly, a trustee could attack a transfer to a church as a fraudulent conveyance. 152 B.R. 939. In *Young,* the debtors had transferred $13,450 to their church in the year preceding bankruptcy. The Court was required to determine: (i) whether the debtors had received reasonably equivalent value; and if not, (ii) whether the interpretation of the statute violated the Free Exercise Clause. As to the first question, the court determined that the services received from the church were available to all members of the congregation, regardless of whether the contributions were made. Thus, the services of the church were not provided in exchange for the donations.

Regarding the constitutional issue, the church asserted that it was unconstitutional not to include religious expenditures in the list of items accorded favorable treatment because as "the principle of tithing is as much a necessity as expenditures for food or clothing, expenditures that the Bankruptcy Code permits as part of a Chapter 13 plan." *Id.* at 952. The church further argued that enlarging the pool of funds from which creditors may be paid is not a compelling government interest, as the Bankruptcy Code exempts specific property. *Id.* at 953. The Court determined that Section 548 had only an incidental effect on religion. The Court further noted that the church's arguments were unpersuasive, because the requirements and purposes of Section 522, exemptions, and Section 1325(b)(2)(A), maintenance and support, were different from the purpose of Section 548, which required a determination of "reasonably equivalent value." The Court held that it was not violating the Free Exercise Clause of the First Amendment to the Constitution in ordering the church to turn over the contributions. *Id.* at 954–955.

The Court in *Lee* had to determine whether the amount the debtors provided as a tithe to their church could be considered in determining the debtors' income in the context of a Section 707(b) motion to dismiss. The Court held that Section 707(b) is a neutral law, and that "[n]othing suggests that § 707(b) was designed to regulate religious beliefs or conduct." 162 B.R. at 42. After determining the Constitutional issue, the Court focused on the issue under Section 707(b) of whether the tithe was an excessive or unreasonable expense.

In *Lee* the Court viewed the cases pertaining to Section 1325 as being persuasive on the issue. Based on these cases, the Court held that the monthly expenses for tithing were unreasonable, because the debtors had not tithed consistently, and the debtors' church did not require tithing as a condition

---

**8.** Justice Scalia further noted that the decisions of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), *Thomas v. Review Board, Indiana Employment Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), should be limited to their facts. 494 U.S. at 882, 110 S.Ct. at 1602. As will be discussed hereinafter, many of the courts which have permitted tithing in the Chapter 13 context have relied on *Hobbie* in their analysis.

for full membership privileges. *Id.*, 162 B.R. at 42.

There are also several courts which have held that under Section 1325, tithing need not be considered in determining what is reasonably necessary for the maintenance or support of the debtor or a dependent of the debtor. *See In re Miles*, 96 B.R. 348 (Bankr. N.D.Fla.1989) (while donations may be source of inner strength, not necessary for maintenance or support); *In re Sturgeon*, 51 B.R. 82 (Bankr.S.D.In.1985) (stated no church law required donation; under circumstances of case, more noble a gesture for the debtor to offer money to unsecured creditors); *In re Ivy*, 1988 WL 409629 (D.Or.1988) *affirmed* 920 F.2d 936 (9th Cir.1990) *cert. denied, Ivy v. Myers*, 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991) (debtors could tithe, but debtors were required to pay same amount to unsecured creditors as debtors who did not tithe); and *In re Packham*, 126 B.R. 603 (Bankr.D.Utah 1991) (as debtors would lose no benefits as a result of their failure to tithe, tithing was not necessary for maintenance or support).[9]

In *Ivy*, the District Court explained that the Bankruptcy Court's refusal to confirm a plan where the debtors were not paying their debts to the same extent as debtors who did not tithe was not an unconstitutional infringement. Rather, the Bankruptcy Court proposed a plan which would allow the debtors to practice freely their religion and satisfy their legal obligations.

The *Packham* decision provides an in-depth analysis, and directly addresses the concerns of the courts which have previously decided the tithing issue. Before analyzing the prior case law, the Court noted that there was no conclusive evidence that the debtors would lose any privileges from their church if they failed to tithe.

The Court explains that "an inquiry into the debtor's 'reasonable and necessary expenses' is unavoidably a judgment of values and lifestyles and close questions emerge." 126 B.R. at 609 *citing In re Sutliff*, 79 B.R. 151, 156–157 (Bankr.N.D.N.Y.1987). Although some courts attempt to avoid imposing their values for those of the debtor, certain sections of the Code require determinations based on a court's sense of equity of what is right and wrong. *Id.* By requiring a court to determine the propriety of a contribution, the courts are forced to determine the legitimacy of the organization, as well as whether the debtor has a *"bona fide* personal commitment". *Id.* at 609–610.

The *Packham* Court also refers to the purpose of Chapter 13, which is to obtain a substantial effort from the debtors in repaying their debts. Congress has recognized that this may "require some sacrifice by the debtor." *Id. citing* S.Rep. No. 65, 98th Cong., 1st Sess. 22 (1983). The Court states that the integrity of the Chapter 13 reorganization process is diminished, if a debtor may include, in his or her budget, the contributions to charitable organizations as a necessary expense, thereby requiring creditors to make a *de facto* contribution to that organization. *Id.*

**9.** Several courts have held that a debtor should be able to continue to tithe, even if the result is to reduce payments to unsecured creditors. The cases which have reached this determination have focused primarily on two facts: (i) that the debtor has tithed consistently; and (ii) that either the debtor's church has required tithing or the debtor has a strong commitment to continue tithing. *See In re Bien*, 95 B.R. 281 (Bankr. D.Conn.1989) (tithe satisfied *bona fide* religious purpose; and the court should not attempt to substitute its values for those of the debtor regarding fundamental aspects of life); *In re Navarro*, 83 B.R. 348 (Bankr.E.D.Pa.1988) (determination of disposable income should not mandate drastic change in lifestyle to fit a preconceived norm; and the court should not superimpose values for those of debtor on basic choices of support); *In re McDaniel*, 126 B.R. 782 (Bankr. D.Minn. 1991) (violation of Free Exercise Clause to hold that tithing is not a reasonable expense *per se* ); *In re Green*, 103 B.R. 852 (W.D.Mich. 1988) *affirming* 73 B.R. 893 (Bankr.W.D.Mich. 1987) (In determining reasonableness of expense, court should not attempt to change lifestyle where there is no obvious indulgence). The Court finds these decisions are unpersuasive in light of the Supreme Court decision of *Smith, supra.* Moreover, the decisions of *McDaniel, supra,* and the Bankruptcy Court decision of *Green, supra,* have relied on the reasoning of the Supreme Court decision of *Hobbie,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), which the recent Supreme Court decision of *Smith, supra,* has limited to its facts.

700

This Court has been asked to determine whether monthly tithing payments have been appropriately included in the list of expenses used by the Debtor in her attempt to prove "undue hardship" under Section 523(a)(8)(B).

The 1990 Supreme Court decision of *Smith*, as well as the reasoning set forth in *Lee* and *Young*, are persuasive on the issues to be determined by this Court. This Court concludes that Section 523(a)(8) is a neutral law, which is not designed to promote or restrict religious beliefs.

There are also independent public policy concerns that must be considered by the Court. The purpose of creating an exception to discharge for student loans is to ensure "the credibility and stability of the student loan program and assure that future generations of students will have a viable loan program available to them." S.Rep. No. 230, 96th Cong., 2d Sess. 1–3 (1979). The student loan exception to discharge has been included to preclude taxpayers from paying for the education of "any individual who [is] capable of paying his own way and who [is] able to repay his loan without substantial hardship." 125 Cong.Rec. H2759 (daily ed. May 7, 1979). This Court must conclude that Congress has intended that Section 523(a)(8) be applied to all debtors who have obtained student loans funded by the government.

Finally, to the extent this Court must consider tithing and whether it is an appropriate expense to be considered in an analysis of what constitutes an undue hardship, this Debtor has failed to meet her burden of proof on the issue. In this case, the Debtor receives services or benefits from her church, irrespective of whether she tithes. The Debtor has a strong commitment to continue to tithe and has done so for a number of years. However, she has also conceded that her church permits her to cease tithing under certain circumstances, such as her impoverishment.

The fact that Debtor is continuing her education in order to increase her future earning capabilities makes the issue of undue hardship easier to determine. Because the Debtor expects to be earning increased wages when she graduates, the Debtor is unable to sustain her burden of proof that her present financial condition is likely to persist for an extended period of time, such that her student loan obligation should be discharged. Irrespective of that finding, this Court has made a separate determination regarding the tithing issue.

United Student Aid Funds, Inc. shall submit a judgment which provides that its indebtedness shall be deemed nondischargeable.