In re Bruce YOUNG and Nancy Young, Debtors.

Julia A. CHRISTIANS, Trustee, Plaintiff,

v.

CRYSTAL EVANGELICAL FREE CHURCH, Bruce Young, and Nancy Young, Defendants.

Bankruptcy No. 4–92–871.

Civ. No. 4–93–76.

Adv. No. 4–92–157.

United States District Court,
D. Minnesota,
Fourth Division.

April 14, 1993.

940

Julia A. Christians, Lapp, Laurie, Libra, Abramson & Thomson, Minneapolis, MN, trustee.

Kenneth Corey–Edstrom, Henningson & Snoxell, Brooklyn Center, MN, for defendant Crystal Evangelical Free Church.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant Crystal Evangelical Free Church's appeal of the bankruptcy court's[1] order granting summary judgment in favor of plaintiff Julia A. Christians, the trustee. The bankruptcy court's order will be affirmed.

### FACTS

The parties stipulated to the following facts. Bruce and Nancy Young (debtors) filed a Chapter 7 bankruptcy petition on February 3, 1992. Plaintiff Julia A. Christians is the trustee in their case. In the year immediately preceding the debtors' filing, debtors contributed a total of $13,450 to defendant Crystal Evangelical Free Church. Debtors were insolvent at the time the contributions were made. In addition to their financial contributions, debtors held a variety of volunteer positions in the church. At no time did the church require debtors to pay any membership or attendance fee, but the church does teach that

---

1. The Honorable Chief Judge Robert J. Kressel, United States Bankruptcy Court for the District of Minnesota.

people should make regular financial contributions.

The trustee brought an adversary proceeding seeking to recover the contributions as "fraudulent transfers" within the meaning of the Bankruptcy Code. The trustee and the church both moved for summary judgment. The bankruptcy court granted the trustee's motion and denied the church's motion. *Christians v. Crystal Evangelical Free Church (In re Young),* 148 B.R. 886, 897 (Bankr.D.Minn.1992). The church appeals.

## DISCUSSION

### I. *Summary Judgment Standard*

■ The Court reviews de novo the bankruptcy court's grant of summary judgment. *McKee v. Federal Kemper Life Assur. Co.,* 927 F.2d 326, 328 (8th Cir.1991); *Steven v. Pike County Bank,* 829 F.2d 693, 695 (8th Cir.1987). A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v.*

*Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### II. *Overview*

The parties raise several issues. Initially, the Court must determine whether, as a matter of statutory interpretation, the bankruptcy court correctly concluded that debtors did not receive "reasonably equivalent value in exchange for" the contributions. If the Court concludes that the bankruptcy court correctly interpreted the statute, the church requests that the Court analyze whether that interpretation of the statute violates the Free Exercise Clause or Establishment Clause of the Constitution. The constitutional analysis can be divided into three stages. First, the Court must decide whether to allow the church to raise constitutional arguments for the first time on appeal. Second, if the Court allows the church to raise those arguments, the Court must decide whether the church has standing to raise constitutional objections on behalf of debtors. Third, if the Court concludes that the church has standing, the Court must then address the merits of the church's constitutional arguments.

### III. *Fraudulent Transfers Under the Bankruptcy Code*

#### A. *Applicable Law*

■ The first issue before the Court is whether the contributions to the church were avoidable transfers within section 548 of the Bankruptcy Code. Section 548 provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of

the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a *reasonably equivalent value in exchange for* such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

11 U.S.C. § 548(a) (emphasis added). For the Court to find that a fraudulent transfer occurred, the trustee must prove the following:

1. there was a transfer of an interest of the debtor in property;

2. the transfer was made within one year before the date of the filing of the petition;

3. the debtor was insolvent on the date the transfer was made; and

4. the debtor received less than a reasonable equivalent value in exchange for the transfer.

*First Nat'l Bank in Anoka v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 417 (D.Minn.1990). The parties stipulated that the first three elements were satisfied; the only issue is whether the debtors received "reasonably equivalent value in exchange for" the contributions. *Christians*, 148 B.R. at 890.

 In determining whether the debtors received reasonably equivalent value, the Court must examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect. *Pembroke Develop. Corp. v. Commonwealth Savings & Loan Assoc. (In re Pembroke Develop. Corp.)*, 124 B.R. 398, 400 (Bankr.S.D.Fla.1991). In other words, a determination of whether the debtor received reasonably equivalent value depends on the facts and circumstances of each case. *Minnesota Utility*, 110 B.R. at 419; *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 618 (Bankr.E.D.Pa.), *aff'd*, 121 B.R. 442 (E.D.Pa.1989). The burden is on the trustee to establish that debtors did not

receive reasonably equivalent value. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 650 (3d Cir.1991), *cert. denied*, ── U.S. ──, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *Minnesota Utility*, 110 B.R. at 417–19.

The Court has previously addressed the issue of what constitutes reasonably equivalent value. In *Minnesota Utility*, a bank extended Minnesota Utility Contracting, a closely-held corporation, a revolving line of credit that was secured by assets of Minnesota Utility. Later, the bank agreed to extend additional credit to Minnesota Utility but only if another closely-held corporation, MUC Leasing, which was owned by the same shareholders that owned Minnesota Utility, granted the bank a security interest in its assets. Both Minnesota Utility and MUC Leasing filed for bankruptcy within one year of the extension of additional credit. The issue was whether MUC Leasing had received reasonably equivalent value for the security interest it granted the bank. The bankruptcy court held that indirect benefits, under certain circumstances, may constitute reasonably equivalent value but that there was no evidence that MUC Leasing received any indirect benefits.

On appeal, the Court stated that "[i]n determining whether a debtor has received fair consideration for the transfer, the Court should consider the purpose of the requirement, which is to conserve the debtor's estate for the benefit of creditors." *Id.* at 420. The Court then held that while indirect benefits could constitute reasonably equivalent value under some circumstances, the benefits received must be "fairly concrete." *Id.* The Court affirmed the bankruptcy court's order because there was no evidence in the record that MUC Leasing received "fairly concrete" indirect benefits.

## B. *The Bankruptcy Court's Order*

The bankruptcy court described the analysis as two-fold. Did the debtors receive "value?" If so, was that "value" given "in exchange for" the contributions? In addressing the question of whether debtors

received "value," the bankruptcy court looked to the statutory definition of that term. For the purposes of section 548—

"value" means *property,* or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor.

11 U.S.C. § 548(d)(2)(A) (emphasis added). Because the church did not satisfy or secure a present or antecedent debt of the debtors in exchange for the donations, the bankruptcy court refined the inquiry to address whether the debtors received "property" in return. 148 B.R. at 890–93.

Based on the following reasoning, the bankruptcy court held that the debtors did not receive "property." First, relying on dictionary definitions of the term "property," the bankruptcy court concluded that property consists of rights and things subject to ownership. *Id.* at 891. Second, based on this definition, the bankruptcy court rejected the church's argument that debtors received "property" in the form of religious services, theological programs, and access to the premises. *Id.* "The debtors did not receive legal or equitable rights nor did they obtain any ownership interest from their contributions." *Id.* Third, the bankruptcy court concluded that the contributions did not yield "value" because they were economically detrimental to the debtors' financial estate. *Id.* at 893. The bankruptcy court found that "it was the debtors individually and not their prepetition financial estate or their post-petition bankruptcy estate that received any benefit." *Id.* Fourth, the bankruptcy court bolstered its conclusion that the church's services were not "property" by asserting that the Establishment Clause might prevent a court from placing a value on those services, a task the court would be required to perform to determine whether the value received was reasonably equivalent to the contributions. *Id.* at 894.

The bankruptcy court then assumed, arguendo, that the debtors did receive "value" from the services of the church. The bankruptcy court held that any "value" the

debtors received was not "in exchange for" their contributions. *Id.* at 895. The bankruptcy court noted that the church welcomes all members to worship regardless of the size of contribution. The court found that the services offered by the church were in no way linked to the debtors' contributions. The bankruptcy court also looked to the Internal Revenue Code for guidance. The court concluded that under the Internal Revenue Code payments made to a religious organization in exchange for a quid pro quo are not deductible. 26 U.S.C. § 170(c)(4); *Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766, *reh'g denied,* 492 U.S. 933, 110 S.Ct. 16, 106 L.Ed.2d 630 (1989). Finding that the church's argument that the debtors received services "in exchange for" the contributions called into question the right of all members to deduct donations, the bankruptcy court held that the same contribution that qualifies for a deduction under the Internal Revenue Code cannot also be "in exchange for" "value" under the terms of the Bankruptcy Code. 148 B.R. at 895.

Finally, the bankruptcy court was sharply critical of two cases finding that religious contributions were not avoidable under section 548. In *Ellenberg v. Chapel Hill Harvester Church, Inc. (In re Moses),* 59 B.R. 815 (Bankr.N.D.Ga.1986), it was undisputed that the debtors had transferred $4,733.50 to their church in the year preceding the filing of their bankruptcy petition and the transfers took place while the debtors were insolvent. One of the debtors served as a deacon at the church and was required to tithe as a holder of that office. The trustee sought to recover the contributions as fraudulent transfers. The bankruptcy court found that the issue was solely one of statutory interpretation. The bankruptcy court recognized that in order for the services to constitute "value," the court first had to find that the services constituted "property." The bankruptcy court held that the debtors received "property" based on the following reasoning. First, the bankruptcy court concluded that because the church required the contributions as a condition of one of the debtor's

employment as a deacon, the contributions could be directly tied to the monetary compensation and benefits he received through his employment by the church. Second, the court found that the debtors received valuable services including marriage counseling and theological education. Third, the court found that the church provided heating, air conditioning, and electrical services for the debtors' comfort during the services they attended and those utility services could constitute exchangeable value. In the end, the bankruptcy court held that the trustee failed to meet his burden of proof because he did not offer adequate evidence that the debtors received less than a reasonably equivalent value in exchange for the contributions.

In reaching its decision in the case at bar, the bankruptcy court was very critical of the *Ellenberg* court. The bankruptcy court stated that *Ellenberg*'s conclusion that services provided by a church could constitute "property" violated the plain language of the statute. *Christians,* 148 B.R. at 896. The bankruptcy court also charged the *Ellenberg* court with neglecting to address the issue of whether the services provided by the church were "in exchange for" the contributions. *Id.* at 895–96. In short, the bankruptcy court concluded that the *Ellenberg* court ignored the statutory language in order to reach the "right" result. *Id.* at 896.

The bankruptcy court was also critical of a case on which the *Ellenberg* court relied. In *Wilson v. Upreach Ministries (In re Missionary Baptist Found. of Am.),* 24 B.R. 973 (Bankr.N.D.Tex.1982), the debtor was the Missionary Baptist Foundation of America (MBFA), a nonprofit corporation which donated money to Upreach Ministries, another nonprofit corporation, within one year of MBFA filing for bankruptcy. There was no doubt that MBFA was insolvent at the time the contributions were made. After the bankruptcy court pointed out that a finding of fraudulent intent was not necessary, the court nevertheless felt it was relevant to highlight the fact that there were no "badges of fraud" in that case. The bankruptcy court held that whether the challenged transfer was for

"reasonably equivalent value" was largely a question of fact and considerable latitude should be afforded to the finder of fact. The court concluded that "reasonably equivalent value" did not require that a monetary equivalent be received in exchange. The bankruptcy court held that the "good will" MBFA received in return for the contributions satisfied the "reasonably equivalent value" requirement and the contributions could not be recovered as fraudulent transfers.

In the instant case, the bankruptcy court criticized *Upreach Ministries* for the same reasons it criticized *Ellenberg.* The bankruptcy court stated that equating "good will" with intangible property which could provide "reasonably equivalent value" ignored the plain language of the Bankruptcy Code. *Christians,* 148 B.R. at 896. The bankruptcy court sympathized with the desire to do what "feel[s] right," but charged the *Upreach Ministries* court with willingly ignoring the statutory language in order to reach that result. *Id.*

### C. *The Parties' Arguments*

The church argues that the bankruptcy court improperly construed section 548. The church begins by arguing that the bankruptcy court disregarded the canon of statutory interpretation that a statute should not be construed in a fashion that raises constitutional issues if another reasonable construction is available. The church asserts that Congress must clearly express an affirmative intention to regulate religious conduct before a statute should be interpreted in a way that interferes with the Establishment Clause and Free Exercise Clause of the First Amendment. The church argues that Congress did not intend section 548 to regulate religious conduct.

Next, the church argues that the bankruptcy court failed to consider the purpose of section 548. The church argues that the title of the statute, "Fraudulent transfers and obligations," indicates that Congress was concerned with unscrupulous creditors and not bona fide charities. The church asserts that because neither the church nor

the debtors intended to defraud creditors, the purpose of section 548 does not apply in this case.

The church also argues that debtors received "value" in return for their contributions for several reasons. First, the church attempts to distinguish *Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766, *reh'g denied*, 492 U.S. 933, 110 S.Ct. 16, 106 L.Ed.2d 630 (1989), which held that any quid pro quo received in return for a contribution renders the contribution non-deductible, by asserting that the different purposes of the Internal Revenue Code and the Bankruptcy Code allow a finding that debtors received "value" in return for their charitable contributions. Second, the church argues that a tax deduction for charitable contributions is "value" received for the purposes of the Bankruptcy Code. Third, the church claims that the spiritual counseling provided for debtors constituted "value." Fourth, the church argues that the debtors' donations allowed the church to pay operating expenses including electricity, heat, and air conditioning, and that debtors received "value" from those utilities while they were at the church. The church contends that there is no requirement in section 548 that the debtor be the only person to receive value or that others cannot enjoy benefits at the same time.

The church also objects to the bankruptcy court's conclusion that even if the debtors did receive "value," it was not "in exchange for" their donations. The church argues that the spiritual counseling, educational, and worship services were provided during the general time frame during which the donations were made and thus were "in exchange for" those services. The church also argues that the debtors received a tax deduction "in exchange for" the donations.

The trustee responds to most of the church's arguments by directing the Court's attention to the reasoning adopted by the bankruptcy court. In short, the trustee first argues that a finding that the debtors received "value" requires a finding that they received "property," and that

debtors received no property in this case. Second, the trustee argues even if the debtors received "value," it was not "in exchange for" their contributions. Third, the trustee argues that a finding that the services provided by the church constituted "value" would force the bankruptcy court into the impossible position of having to place a dollar value on those services in order to determine whether they were of "reasonably equivalent value" to the contributions. Finally, the trustee objects to the church's argument that a tax deduction was "value" received "in exchange for" the contributions on the grounds that the argument is being raised for the first time on appeal.

### D. *Analysis*

The Court finds that the bankruptcy court adopted the proper analytical framework and interpreted section 548 correctly. There are two issues: (1) did the debtors receive "reasonably equivalent value" for their contributions, and if so (2) were the contributions given "in exchange for" that "value."

#### 1. *Did Debtors Receive "Reasonably Equivalent Value"?*

The Court concludes that debtors did not receive "reasonably equivalent value," within the meaning of the Bankruptcy Code, for their contributions. "Value" is defined by the Bankruptcy Code. "Value" must be either "property, or satisfaction or securing of a present or antecedent debt." 11 U.S.C. § 548(d)(2)(A). The parties agree that the key issue is whether debtors received some sort of property right. The Court finds that they did not. Debtors stipulated that they could have taken advantage of the services offered by the church regardless of whether they made any financial contributions, but that the church encouraged regular donations. In other words, debtors made the contributions out of a "sense of religious obligation." Appellant's Mem. at 13. A debtor cannot receive reasonably equivalent value for payments that are made out of a sense of moral obligation rather than legal obligation. *See Whitlock v. Hause (In re*

*Hause)*, 13 B.R. 75, 79 (Bankr.D.Mass. 1981). Moreover, emotional support received in exchange for a transfer, without more, cannot satisfy the requirement for reasonably equivalent value. *Walker v. Treadwell (Matter of Treadwell)*, 699 F.2d 1050, 1051 (11th Cir.1983). "The object of section 548 is to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property." *Id.* Charitable contributions are clearly gratuitous transfers, despite the fact that debtors feel morally obligated to tithe. Strictly as a matter of statutory interpretation, there are no justifiable grounds to differentiate between religious donations and other gratuitous transfers, such as gifts to family members, which are clearly avoidable. *Walker*, 699 F.2d at 1051.

■■■■■ The Court concludes that the church's argument that the tax deduction debtors received for the contributions was "reasonably equivalent value" is also unpersuasive. The ability to deduct an amount of money from gross income cannot, in economic terms, be of "reasonably equivalent value" to that same amount in cash that has been removed from the estate. *See Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201, 203 (5th Cir.1980) (establishing rule that any transfer for less than 70 percent of market value of the property is per se not reasonably equivalent value).

■■■■■ Finally, the bankruptcy court was correct to look to Supreme Court precedent in connection with the Internal Revenue Code for assistance. In *Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766, *reh'g denied*, 492 U.S. 933, 110 S.Ct. 16, 106 L.Ed.2d 630 (1989), the Supreme Court addressed the issue of whether fixed-level donations to a religious organization can be deducted from taxable income when specific services are provided by the religious organization in return for the fixed donation. The Court found that a quid pro quo analysis was appropriate. *Id.* 490 U.S. at 691, 109 S.Ct. at 2145. The Court held that a charitable contribution is deductible only if it is without adequate consideration. *Id.* 490 U.S. at 690, 109

S.Ct. at 2144. Given this ruling, by definition if a charitable contribution is deductible, *i.e.* without adequate consideration, it cannot be in exchange for "reasonably equivalent value." *See Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981) (fair consideration for bankruptcy purposes is more than consideration needed to support a simple contract).

### 2. *If Debtors Received "Reasonably Equivalent Value," Was It "In Exchange For" Contributions?*

■■■■■ Even if the debtors received "reasonably equivalent value," the Court finds that the church did not provide that value "in exchange for" the debtors' contributions. The parties stipulated that the church's support and services are available to all, regardless whether contributions are made. This stipulation precludes a finding that the church provided its services "in exchange for" debtors' contributions. The church's argument that debtors received a tax deduction "in exchange for" the contributions is also unpersuasive. A charitable contribution is deductible only if there is no quid pro quo. *Hernandez*, 490 U.S. at 690, 109 S.Ct. at 2144. The Court declines to hold that although a tax deduction is not a quid pro quo for a donation, a tax deduction is given "in exchange for" a donation. *See Rubin*, 661 F.2d at 991.

### 3. *Other Case Law*

The Court agrees with the bankruptcy court's conclusion that the other cases addressing this issue have glossed-over the statutory requirements in order to reach the "right" result. In *Wilson v. Upreach Ministries (In re Missionary Baptist Found. of Am.)*, 24 B.R. 973 (Bankr. N.D.Tex.1982), the bankruptcy court concluded that "reasonably equivalent value" did not require that a monetary equivalent be received in exchange. *Id.* at 979. The bankruptcy court held that the "good-will" received in return for the contributions satisfied the "reasonably equivalent value" requirement and the contributions could not be recovered as fraudulent transfers. *Id. Upreach Ministries* is inconsistent with

this Court's precedent stating that the benefits received must be "fairly concrete." *First Nat'l Bank in Anoka v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 420 (D.Minn.1990). Moreover, the *Upreach Ministries* court did not discuss whether the contributions were given "in exchange for" the good-will it received. For these reasons, the Court declines to follow *Upreach Ministries*.

Turning to *Ellenberg v. Chapel Hill Harvester Church, Inc. (In re Moses)*, 59 B.R. 815 (Bankr.N.D.Ga.1986), while the Court finds that this case's analysis suffers from many of the same flaws of *Upreach Ministries*, it is also distinguishable from the case at bar. In *Ellenberg*, the bankruptcy court premised its holding in part on the fact that the church required the contributions as a condition of one of the debtor's employment as a deacon and thus the contributions could be directly tied to the monetary compensation and benefits he received through his employment by the church. *Id.* In this case, the debtors have stipulated that they were not required to tithe. Accordingly, the Court concludes that debtors did not receive value in exchange for their contributions.

#### 4. *Summary*

The church states that it is offended at the characterization of the transfers as "fraudulent." Unfortunately, that is the label the Bankruptcy Code places on transactions that harm the interests of creditors in general, and fraudulent intent is not required. *Ellenberg*, 59 B.R. at 819. While describing the donations as "avoidable transfers" rather than "fraudulent transfers" may be more appropriate because it lessens the inference of culpability, the purpose of section 548 is where attention should be focused. The avoiding powers of the Bankruptcy Code are designed to maximize the size of the estate in order to maximize the distribution to innocent creditors. *Minnesota Utility*, 110 B.R. at 417. The fact that debtors made gratuitous transfers to their church rather than to, for example, family members or some non-religious charity does not materially alter the

analysis. In short, the Court concludes that, as a matter of statutory interpretation, debtors did not receive "reasonably equivalent value" from the church's services and, even if the church's services constituted "reasonably equivalent value," the services were not provided "in exchange for" the debtors' $13,450 in donations.

### IV. *Constitutional Issues*

The church argues that if the Court finds that the debtors' donations were avoidable transfers under section 548, applying section 548 in this case would violate the Free Exercise and Establishment Clauses of the Constitution. Before addressing the merits of those arguments, however, the Court must decide whether the church can raise constitutional issues for the first time on appeal and whether the church has standing to raise constitutional objections on behalf of the debtors.

#### A. *Issues Raised for the First Time on Appeal*

 The church admits that it is seeking to raise constitutional arguments for the first time on appeal. Although the general rule is that an appellate court should not consider arguments not presented to the trial court, a blanket prohibition on new arguments is far too broad. *Universal Title Ins. Co. v. United States*, 942 F.2d 1311, 1314 (8th Cir.1991). The appellate court has discretion in light of the facts and circumstances of a particular case to consider an issue for the first time on appeal. *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). The Court should exercise this discretion carefully, however, and should consider whether the proper resolution is beyond any doubt, whether injustice might otherwise result, or whether the argument involves a purely legal issue on which no additional evidence or argument would affect the outcome of the case. *Id.; Universal Title*, 942 F.2d at 1314–15.

 The church argues that because the bankruptcy court noted in its opinion that constitutional questions may exist, the church should be allowed to argue this

point on appeal. The trustee objects and asserts that the bankruptcy court's mention of potential constitutional questions was merely dicta and cannot provide the basis for the Court to disregard the general rule that issues cannot be raised for the first time on appeal.

The Court will exercise its discretion to consider the church's constitutional arguments because they involve purely legal issues on which no additional evidence would affect the outcome of the case. *Universal Title,* 942 F.2d at 1314–15. However, although the Court finds that the church is not procedurally barred from raising constitutional issues, the church must also establish that it has standing to raise constitutional issues.

**B.** *Standing*

The trustee asserts that the church does not have standing to raise constitutional arguments because those claims must be brought by the debtors. The church relies on principles of third-party standing to overcome this objection.

 The Supreme Court has held that standing rules differ depending on whether claims are based on the Free Exercise Clause or the Establishment Clause. Generally, individuals must allege infringement on their own religious freedoms to bring a Free Exercise Clause claim. *McGowan v. Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961). There is an exception to the general rule which permits a litigant to raise the religious rights of third-parties if the third-parties cannot effectively assert those rights themselves. *Id.* at 430, 81 S.Ct. at 1107; *Corey v. City of Dallas,* 492 F.2d 496, 497 (5th Cir.1974). Standing under the Establishment Clause is broader than under the Free Exercise Clause because the Establishment Clause is designed to protect more than an individual's rights; it also protects society against "political tyranny and subversion of civil authority." *McGowan,* 366 U.S. at 430, 81 S.Ct. at 1107.

 The church clearly has standing to challenge the bankruptcy court's order to return the donations as a violation of the separation between church and state. However, a determination whether the church should be allowed to raise objections based on an alleged violation of debtors' free-exercise rights requires an analysis of whether debtors could effectively assert those rights themselves. *McGowan,* 366 U.S. at 430, 81 S.Ct. at 1107. The Court concludes that debtors cannot effectively assert those rights. The debtors' estate and the church are parties in this proceeding; the debtors are not directly involved. Thus, debtors cannot effectively assert their free exercise rights in this case. Moreover, there is no indication that debtors might be able to assert their free exercise rights in some other forum. Accordingly, the Court finds that the church has standing to raise both Establishment Clause and Free Exercise Clause issues.

**C.** *Merits of the Constitutional Arguments*

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Am. I. The church presents several constitutional arguments which overlap in many respects. Generally, however, the church argues that the bankruptcy court's order violates the Free Exercise Clause and the Establishment Clause of the First Amendment.

**1.** *Free Exercise Clause*

 The Free Exercise Clause prohibits governmental regulation of religious beliefs. *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). However, "[n]ot all burdens on religion are unconstitutional." *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). The government may regulate conduct or acts which have only an "incidental effect" on religion. *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990). Thus, an individual cannot escape a valid and neutral law of general applicability by merely asserting that the law violates his or her religious beliefs. *Id.* 494 U.S. at

878–80, 110 S.Ct. at 1600–01. A law of general applicability may, however, violate the First Amendment if other constitutional protections, such as freedom of speech, are also at stake. *Id.* 494 U.S. at 880–82, 110 S.Ct. at 1601–02. Absent evidence that a law is designed to regulate religious conduct or beliefs, the law is presumed to be a neutral law of general applicability. *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464, 472 (8th Cir.1991).

The Supreme Court's decision in *Smith* "dramatically altered the manner in which we must evaluate free exercise complaints." *American Friends Service Cmte. v. Thornburgh,* 961 F.2d 1405, 1407 (9th Cir.1991). The Third Circuit has described the change in free exercise doctrine as follows:

Prior to [*Employment Division, Dept. of Human Resources of Oregon v.*] *Smith* [494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)], the case law of the inferior courts construing the free exercise jurisprudence of the Supreme Court consistently concluded that application of any statute to prohibit such a religious practice must be subjected to compelling scrutiny. This understanding was erroneous.... Indeed, the Court held that a criminal statute of general applicability not directed at religious practices is simply not subject to free exercise challenge.... [T]he rationale of the *Smith* opinion is not logically confined to cases involving criminal statutes.

*Salvation Army v. New Jersey Dept. of Community Affairs,* 919 F.2d 183, 194–95 (3d Cir.1990).

The church argues that the bankruptcy court's order violates the debtors' free exercise rights in several respects. First, the church asserts that the court's interpretation of the Bankruptcy Code results in discrimination against religion. The Code treats a variety of expenditures and property more favorably than other expenditures and property. For example, section 522 allows a debtor to exempt from property of the estate a residence, a motor vehicle, and a limited amount of household goods and furnishings, among other things. 11 U.S.C. § 522(d). The church argues that it is unconstitutional to not include religious expenditures in the list of items accorded favorable treatment under the Code. The church emphasizes the strength of the debtors' religious beliefs and argues that the principle of tithing is as much a matter of necessity as expenditures for food or clothing, expenditures that the Bankruptcy Code permits as part of a Chapter 13 plan. In short, the church argues that the "Free Exercise Clause mandates that tithes made to a church out of a sense of religious obligation or requirement be treated in the same manner as the many other items that are treated by the Code as exempt property or permitted personal expenditures." Appellant's Mem. at 13. In support of this argument, the church cites several cases which have held that confirmation of a Chapter 13 plan which provides for regular religious donations does not violate the Constitution. *In re McDaniel,* 126 B.R. 782, 784–85 (Bankr.D.Minn.1991) (per se prohibition on religious contributions as reasonably necessary expense would violate free exercise rights, but prohibition on excessive donations does not); *In re Bien,* 95 B.R. 281, 283 (Bankr.D.Conn.1989) (nondiscretionary tithing constituted reasonably necessary expenditure and included in plan); *In re Navarro,* 83 B.R. 348 (Bankr. E.D.Pa.1988) (confirmation of plan which included tithing would not force creditor to support religious views in violation of the Establishment Clause); *In re Green,* 73 B.R. 893 (Bankr.W.D.Mich.1987), *aff'd,* 103 B.R. 852 (W.D.Mich.1988) (plan which provides for tithing does not violate the Establishment Clause; in fact, denial of confirmation solely because it included tithing would violate Free Exercise Clause).

Second, the church argues that the bankruptcy court's order violates debtors' rights to freely exercise their religion. The church asserts that the Supreme Court's decision in *Smith* does not apply to the case at bar. The church argues that the Bankruptcy Code is not a neutral law of general applicability because it contains many provisions which call for courts to make decisions based on the particular facts and circumstances of a case. Thus,

the church asserts, the trustee must establish that the return of the contributions will serve a compelling state interest that cannot be achieved through less restrictive means. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The church argues that enlarging the pool of funds from which creditors may make claims cannot be deemed a compelling governmental interest. The church asserts that the fact that the Bankruptcy Code exempts certain property from the estate and allows certain necessary expenditures establishes that maximizing the funds available to creditors is not a compelling governmental interest.

Third, the church argues that the bankruptcy court's order violates debtors' "hybrid" free exercise/free speech rights to support their religion. In *Smith*, the Supreme Court left the door open for challenges to neutral laws of general applicability when the laws impact not only the free exercise of religion, but some other constitutional protection as well. The church argues that through their contributions the debtors were supporting the dissemination of a particular message protected by the Free Speech Clause. The church asserts that this "hybrid" free speech/freedom of religion argument must be analyzed under the compelling interest and less restrictive means test. The church contends that the trustee cannot satisfy this test.

The trustee directly responds to each of the church's arguments. First, the trustee argues that section 548 is a neutral statute of general applicability. The trustee points out that section 548 applies to "any transfer." The trustee also argues that it is inappropriate to compare section 522, which exempts certain property from the estate, and section 1325, which provides for certain expenditures that are reasonably necessary for maintenance and support, with section 548, which governs fraudulent transfers. The trustee argues that these statutory provisions serve distinct purposes and that these distinct purposes explain why different results may occur under each provision. Moreover, the trustee argues, different results under different Code provisions is not equivalent to disparate treatment on the basis of religion. Second, the trustee argues that because this dispute involves a neutral statute of general applicability, the Supreme Court's holding in *Smith* requires a finding that the Free Exercise Clause has not been violated. The trustee asserts that the infringement on religious freedom in this case is merely an "incidental effect" of this neutral statute. Finally, the trustee asks the Court to reject the church's "hybrid" free speech/free exercise claim. The trustee argues that the cases cited by the Supreme Court in describing such a claim were all decided on the basis of free speech principles. The trustee asserts that this case does not involve substantial free speech elements and the *Smith* analysis controls.

The Court concludes that section 548 is a neutral statute of general applicability. There is no evidence in the statutory text or otherwise that section 548 was designed to regulate religious beliefs or conduct. Thus, section 548 is presumed to be a neutral law of general applicability. *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir.1991). The issue is whether section 548 has more than an "incidental effect" on religion. *Smith*, 494 U.S. at 878, 110 S.Ct. at 1600. The Court finds that it does not. The purpose of the statute is to enlarge the pool of funds for creditors by recovering gratuitous transfers made on the eve of bankruptcy by insolvent debtors. *First Nat'l Bank in Anoka v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 417 (D.Minn.1990). There is no evidence that in achieving this purpose section 548 has had any more than an "incidental effect" on religion. A variety of other laws, federal and state, clearly apply to religious organizations and its members, *see, e.g., Hernandez v. C.I.R.*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989) (suit brought to enforce Internal Revenue Code); *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security); *South Ridge Baptist Church v. Industrial Comm. of Ohio*, 911 F.2d 1203

(6th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991) (workers' compensation); *E.E.O.C. v. Tree of Life Christian Schools,* 751 F.Supp. 700 (S.D.Ohio 1990) (Equal Pay Act); *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1991) (minimum wage laws), and the Court finds that the Bankruptcy Code is no different. In short, because section 548 is a neutral law of general applicability, and because the statute has only an "incidental effect" on religion, the church's free exercise challenge fails. *Salvation Army v. New Jersey Dept. of Community Affairs,* 919 F.2d 183, 194–95 (3d Cir.1990).

■■■ Even if *Smith* did not apply in this case, the Court is satisfied that the Bankruptcy Code is designed to advance a compelling government interest. *See, e.g., Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989) (Internal Revenue Code serves compelling governmental interest); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security). The government's policy of allowing debtors to get a fresh start while at the same time treating creditors as fairly as possible qualifies as a compelling interest. Again, however, this is of limited relevance because *Smith* does not require the finding of a compelling interest.

■■■ The Court also finds unpersuasive the church's argument that section 548 unfairly discriminates against religious contributions. The church asks the Court to find unfair discrimination based on the fact that section 522 exempts a variety of property, but not religious donations, from the property of the estate and the fact that several courts have allowed religious donations to be made under the terms of a Chapter 13 plan. The Court cannot accept this argument because the requirements and purposes of these provisions are different. Section 522 allows a debtor to exempt some property from the estate in order to allow the debtor to get a fresh start. *Johnson v. Ford Motor Credit Co. (In re Johnson),* 57 B.R. 635, 639 (Bankr.N.D.Ill.1986). Courts

allowing tithing under the terms of a Chapter 13 plan have found it to be "reasonably necessary ... for the maintenance or support of the debtor." 11 U.S.C. § 1325(b)(2). By contrast, section 548 calls for a determination whether "reasonably equivalent value" was received "in exchange for" the contributions. The different purposes of these statutory provisions make clear that the Bankruptcy Code tries to treat both debtors and creditors fairly. It does not establish that section 548 unfairly discriminates against religion.

■■■ Finally, the Court is unpersuaded by the church's argument that their contributions were for the support of the dissemination of a particular message and thus their free speech rights have been violated. A limitation on the amount that a person may contribute to a cause "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley v. Vako,* 424 U.S. 1, 20–21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976) (per curiam). Contributions are symbolic acts of support, rather than expository acts of advocacy. *Id.* at 21, 96 S.Ct. at 635. Moreover, even if section 548 has the effect of regulating speech, a content-neutral law is constitutional if it is narrowly tailored to serve a significant governmental interest and leaves open alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 796–97, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989). As the Court stated earlier, section 548 is designed to serve a significant governmental interest—maximizing the amount creditors are able to recover. Alternative channels of communication are also available. Debtors remain able to support the message of the church in a variety of ways. A limitation on the amount a person may contribute to an organization does not infringe on the contributor's freedom to discuss the particular message of that organization. *Buckley,* 424 U.S. at 21, 96 S.Ct. at 635.

In short, the Court holds that an order for the church to turn over debtors' contributions, which were made while the debt-

ors were insolvent, does not violate debtors' free exercise or free speech rights.

## 2. *The Establishment Clause*

 A statute or governmental action will not violate the Establishment Clause if it can pass a three-pronged test: (1) it must have a secular purpose; (2) its primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster "an excessive government entanglement with religion." *Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

The church argues that, in addition to burdening debtors' free exercise rights, the bankruptcy court's order violates the church's rights by interfering in the autonomy of the church and entangling government in the operations and activities of the church. The church argues that if the bankruptcy court's order is affirmed, the church will constantly be concerned that courts will seize contributions made by members and thus the church will constantly be concerned about its financial stability. The trustee responds by arguing that Establishment Clause concerns are wholly lacking in this case. The trustee asserts that an Establishment Clause claim would arise only if the Court accepted the church's arguments and granted special treatment under section 548.

 The Court concludes that the bankruptcy court's interpretation of section 548 does not violate the Establishment Clause. First, section 548 has a secular purpose—to maximize the size of the estate. The provision is neutral in both design and purpose. *See Hernandez v. C.I.R.,* 490 U.S. 680, 695, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989). Second, the primary effect of section 548 is neither to advance nor inhibit religion. The mere fact that the government brings suit to enforce a religious entity's compliance with a statute does not elevate the primary effect of the statute to one that inhibits religion. *See, e.g., Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989) (suit brought to enforce Internal Revenue Code); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security). Third, section 548 does not threaten excessive entanglement between church and state. The routine enforcement of statutes which involves no inquiries into religious doctrine does not violate the nonentanglement command. *Hernandez,* 490 U.S. at 695, 109 S.Ct. at 2147. Moreover, the fact that the government is forcing the church to disburse funds does not result in excessive entanglement. *Jimmy Swaggert Ministries v. Bd. of Equalization,* 493 U.S. 378, 393, 110 S.Ct. 688, 698, 107 L.Ed.2d 796 (1990); *South Ridge Baptist Church v. Industrial Comm. of Ohio,* 911 F.2d 1203, 1210–11 (6th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991). Finally, the Court agrees with the bankruptcy court's opinion that a ruling in favor of the church could lead to Establishment Clause problems. If the Court held that the debtors received "value" "in exchange for" their contributions, the next issue would be to quantify that "value" to determine if it was "reasonably equivalent" to the amount of the contributions. Such a subjective inquiry could be "fraught with the sort of entanglement that the Constitution forbids." *Lemon v. Kurtzman,* 403 U.S. 602, 620, 91 S.Ct. 2105, 2115, 29 L.Ed.2d 745 (1971).

In short, the Court holds that an order for the church to turn over debtors' contributions does not violate the Establishment Clause.

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

**IT IS ORDERED** that the order of the bankruptcy court is affirmed.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**