**In re Michael Leroy FAULKNER and Donna Evelyn Faulkner, Debtors.**

**Bankruptcy No. 93–30411.**

United States Bankruptcy Court, W.D. Missouri.

March 28, 1994.

of creditors, it was still incumbent upon him to file amended schedules.

Cobb Young, Joplin, MO, for debtors.

Robert Lantz, Office of the U.S. Trustee, Kansas City, MO, for U.S. Trustee.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

The United States Trustee (the "Trustee") moves to dismiss this bankruptcy case for substantial abuse. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The main issue is the allowability of charitable contributions in computing expenses. For the reasons set forth below, I will dismiss this case pursuant to 11 U.S.C. § 707(b), unless debtors convert to Chapter 13 within 20 days.

## FACTUAL BACKGROUND

Debtors are both employed. Mr. Faulkner is a truck driver and has worked for ABF Freight System, Inc. for eight years. Mrs. Faulkner is a bus driver and has driven a school bus for the Joplin School District for fourteen years. They have a sixteen year old son who is a junior in high school. Debtors' Schedules reflect net monthly income of $2,607.09 and monthly expenses of $2,520.00. An issue exists as to whether these figures

are both accurate and reasonable. Debtors' Schedules also reflect unsecured debt of $25,594.87, of which $16,334.35 represents a deficiency claim by the Joplin Employees Credit Union on a repossessed car and motorcycle incurred in 1987. There is an additional deficiency claim for $1,120.11 from Roper Pontiac incurred in 1979. The remainder of debtors' unsecured claims are for medical care dating from 1986, with the exception of one debt for $626.00 for jewelry purchased in 1992.

## DISCUSSION

The Code provides that:

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

 The first issue is whether the debts listed by the debtors are primarily consumer debts. The Code defines "consumer debt" as debt incurred by an individual primarily for personal, family, or household purposes. 11 U.S.C. § 101(7). In order to determine that a debt is statutorily classified as a consumer debt, the Court must look to the purpose of the debt. *In re Kelly*, 841 F.2d 908, 913 (9th Cir.1988). Some courts rule that consumer debt does not include transactions involving a profit motive. *In re Booth*, 858 F.2d 1051, 1055 (5th Cir.1988). In the present case, the majority of unsecured debt is represented by deficiency claims on motor vehicles as well as claims for medical care and jewelry. It is undisputed that the debtors' credit transactions were incurred for personal, family, or household purposes and not with a profit

motive. Therefore, the debts listed by the debtors are primarily consumer debts.

The second issue is whether granting relief would be a substantial abuse of the provisions of Chapter 7. The term "substantial abuse" is not defined by the Code. *In re Grant*, 51 B.R. 385, 392 (Bankr.N.D.Ohio 1985). However, Eighth Circuit case law holds that the primary factor in ascertaining substantial abuse is the debtors' ability to pay their debts when due, determined by their ability to fund a Chapter 13 plan. *In re Walton*, 866 F.2d 981, 985 (8th Cir.1989).

The Trustee noted a discrepancy between the net income debtors listed on their bankruptcy schedules and the average income indicated by their pay stubs. Debtors now agree that Mrs. Faulkner's net monthly income should be adjusted upwards by $122.01.[1] In addition, the Trustee claimed that debtors received a tax refund of $502.00 in 1992, indicating debtors overwithheld by $41.84 per month. By these calculations, debtors' net monthly income is $2,770.94.

Debtors scheduled $2,520.00 in monthly expenses. There are three areas of dispute regarding such expenses. First, the Schedules list utility expenses of $160.00. The debtors acknowledged at trial that their average utility bills total $137.48; thus, utilities bills for these purposes should be reduced to that amount.

Secondly, the Schedules reflect that Mr. Faulkner sets aside $35.00 per month for car repairs and day-to-day living expenses. Those expenses are reflected in other categories, so they are not allowable.

These two expense reductions alone would not leave enough net disposable income to justify a substantial abuse finding. The third area of dispute, charitable contributions, tips the balance in either direction. Debtors claim to contribute $300.00 each month to their church. Mrs. Faulkner testified that they have tithed ten percent of their income to the church since joining three years ago. She also stated that tithing is not a condition

---

**1.** The Trustee states in his motion that Mr. Faulkner's income was understated by $250.84 a month. However, debtors responded that they only submitted four months of pay stubs to the trustee. Because Mr. Faulkner's work is rather seasonal, pay stubs for an entire year indicate that the actual average wage is as reflected on the schedules. Debtors do agree, however, that Mrs. Faulkner's net income should be adjusted upward by $122.01.

of membership in their church, but that the debtors feel it is an obligation imposed by the Bible.

■ The Western District of Missouri has followed the rule that tithing is not a reasonably necessary expenditure for the maintenance and support of a debtor in Chapter 13 cases, but that a nominal amount of charitable contributions may be permissible in proper circumstances. *In re Reynolds,* 83 B.R. 684, 685 (Bankr.W.D.Mo.1988). Since the Chapter 7 substantial abuse determination is based primarily on whether a debtor could make substantial payments under Chapter 13, the same analysis would apply in this Chapter 7 case. In *Reynolds,* debtors were allowed to donate no more than three percent of gross income to their church. The Court indicated that no greater amount would be allowed unless very unusual circumstances existed in a particular case. *Id.* Here, by reducing debtors' ten percent contribution to three percent, an additional $216.87 per month could be dedicated to prepetition debt. That amount, combined with the reduction in utility bills, car repairs reserve, and day-to-day living expenses, would reduce the allowable monthly expenses to $2,245.61. When subtracted from the net monthly income of $2,770.94, the debtors would be left with net disposable income of $525.33 per month. Given total unsecured debt of $25,594.87, the debtors would be able to pay approximately 73.88% of such unsecured debt over the term of a thirty-six month Chapter 13 plan. The ability of the debtors to fund a Chapter 13 plan with payments to unsecured creditors in that amount would certainly mandate a substantial abuse finding. *See United States Trustee v. Harris (In re Harris),* 960 F.2d 74, 77 (8th Cir.1992). For that reason alone, the trustee's motion to dismiss should be sustained.

■ Furthermore, *Reynolds* does not guarantee that debtors will be provided as much as a three percent allowance for charitable giving in all cases. 83 B.R. at 685. In a given case, the amount of an allowable charitable contribution depends upon factors unique to that case, recognizing that courts allow debtors some discretion in their spending habits. If a debtor chooses to restrict his personal expenses for such items as clothing, travel, and recreation in order to increase his charitable contributions, those contributions do not necessarily cause a substantial abuse.

*Reynolds* also recognizes, as does the weight of case law, that the giving of charitable contributions is not a right protected by the free exercise clause of the First Amendment to the United States Constitution. That conclusion is buttressed by two Supreme Court decisions handed down since *Reynolds.* In *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), a state denied unemployment benefits to two Native Americans who had been discharged from their jobs at a drug rehabilitation organization after their employer discovered that they had ingested peyote, an illegal drug, as part of a religious ceremony. The Court interpreted the text of the free exercise clause, in the context of the tax law, to say "that if prohibiting the exercise of religion ... is not the object of the tax but merely the incidental effect of the generally applicable and otherwise valid provision, the First Amendment has not been offended." *Id.* at 878, 110 S.Ct. at 1599. Justice Scalia, for the Court, continued, "Our decisions have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the state is free to regulate." *Id.* at 878–79, 110 S.Ct. at 1599–1600. And, Justice Scalia also stated the Court's decisions "have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that this religion prescribes (or proscribes).'" *Id.* at 879, 110 S.Ct. at 1600. In the second case, *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), Justice Kennedy wrote that "[i]n addressing the constitutional protection for the free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening

a particular religious practice." *Id.* at ——, 113 S.Ct. at 226. *See also, In re Lee,* 162 B.R. 31, 42 (Bankr.N.D.Ga.1993).

Based on this analysis of the free exercise clause, at least one District Court has held that the fraudulent transfer provision of the Bankruptcy Code is "a neutral law of general applicability", which does not violate the First Amendment. *Christians v. Crystal Evangelical Free Church (In re Young),* 152 B.R. 939 (D.Minn.1993). In *Young* a bankruptcy trustee brought suit against the church to recover as fraudulent transfers certain pre-bankruptcy contributions that had been made to the church by the debtors. *Id.* at 944. The church contended that the avoidance of such contributions under 11 U.S.C. § 548 would violate the free exercise clause. *Id.* The Court found that section 548 had no more than an incidental affect on religion and noted that "[t]he purpose of the statute is to enlarge the pool of funds for creditors by recovering gratuitous transfers made on the eve of bankruptcy by insolvent debtors." *Id.* at 953. The Court therefore dismissed the church's constitutional challenge to the application of section 548. *Id.* at 954.

Section 707(b) is, likewise, a neutral law of general applicability. Nothing suggests that section 707(b) was designed to regulate religious beliefs or conduct. In fact, the legislative history indicates that Congress amended the Bankruptcy Code and added section 707(b) in order to reduce the number of consumer debts annually discharged by debtors who had the ability to fund a Chapter 13 plan. *In re Grant,* 51 B.R. 385, 392 (Bankr. N.D.Ohio 1985). As shown, the free exercise clause does not require an exception for religious practice when the applicable statute is a valid and neutral law of general applicability.

Finally, I should point out that in response to the *Smith* case, Congress enacted the Religious Freedom Restoration Act of 1993. 107 Stat. 1488 (1993). (42 U.S.C. § 2000bb). That statute provides in relevant part as follows:

> *Section 3. Free Exercise of Religion Protected.*

> (a) IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
>
> (b) EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.
>
> . . .

> *Section 7. Establishment Clause Unaffected.*
>
> Nothing in this Act shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this Section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this Act. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

107 Stat. 1488 (1993). (42 U.S.C. § 2000bb).

■ The issue then is whether application of Section 707(b) of the Bankruptcy Code to limit charitable contributions "substantially burdens" the exercise of religion. Surely, the Religious Freedom Restoration Act would not allow a debtor who pledges to tithe to receive a chapter 7 discharge when another similarly situated debtor who does not tithe would not receive such a discharge. The Bankruptcy Code was enacted to give debtors relief from obligations imposed under state law. Neither state, nor federal, law exempts from claims of creditors those assets a debtor intends to donate to charity. *See,* Mo.Stat.Ann. 513.430, 513.440 and 513.475 (Supp.1993); 11 U.S.C. § 522(b). Outside bankruptcy, therefore, a debtor's wages would be subject to garnishment by creditors

irrespective of that debtor's intention to donate a portion of such wages to a church. The fact that the debtor is required to proceed under Chapter 13, rather than Chapter 7, cannot be said to substantially burden that debtor's exercise of religion. *See, In re Ivy*, 1988 WL 409629 (D.Or.), *aff'd* 920 F.2d 936, 1990 WL 198634 (9th Cir.) (Table). Instead, as has been the law in this District, the Court in ruling on a Chapter 13 plan simply considers the extent of charitable contributions, the amount of disposable income which would be available after the contribution, the payments proposed under the plan, and other factors. Consideration of those factors in determining whether a Chapter 7 filing is substantial abuse does not substantially burden the free exercise of religion. In this case, due to the amount of disposable income which would be available in the absence of charitable contributions, I find that the granting of Chapter 7 relief would be a substantial abuse, and that if debtors wish to obtain relief under the Bankruptcy Code they are required to proceed under Chapter 13.